[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-13173
Non-Argument Calendar

_____

D.C. Docket No. 3:17-cv-00609-MMH-JRK


JOHNNY MACK MITCHELL,

Plaintiff-Appellant,

versus

PILGRIM'S PRIDE CORPORATION,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(June 1, 2020)

Before MARTIN, ROSENBAUM, and LUCK, Circuit Judges.

PER CURIAM:

Johnny Mack Mitchell sued his employer, Pilgrim's Pride Corporation, claiming race and disability discrimination under Florida and federal law as well as interference and retaliation under the Family & Medical Leave Act. The district court granted summary judgment in favor of Pilgrim's. We affirm.

## FACTUAL BACKGROUND[1]

In 1991, Mitchell began working at a poultry plant in Live Oak, Florida. When Pilgrim's bought the plant in 2008, Mitchell was assigned to work as a live hanger in the live shed, where he reported to supervisor Kenneth Burnham and superintendent James Johnson. As a live hanger, Mitchell used both hands to hang live chickens to shackles on the production line. Mitchell was expected to hang twenty-eight chickens a minute, approximately one chicken every two seconds.

In February 2013, Mitchell began experiencing shoulder and arm pain as a result of repetitive hanging. Pilgrim's transferred Mitchell to a light-duty assignment, but once he started feeling better, the company reassigned him to the live shed. Mitchell's pain then got worse after he started hanging chickens again. In June 2014, Mitchell applied for workers' compensation benefits for "bilateral

---

[1] We give the facts in the light most favorable to Mitchell. See Buckner v. Toro, 116 F.3d 450, 452 (11th Cir. 1997) ("We review a grant of summary judgment de novo, viewing all the facts and reasonable inferences in the light most favorable to the nonmoving party.").

2

shoulder pain." After a series of medical appointments, Mitchell was diagnosed with "bilateral rotor cuff tendinopathy, impingement signs, mild a.c. joint arthritis bilaterally, and repetitive use injury."

In January 2015, Mitchell had surgery to repair a rotator cuff tear in his left shoulder. Mitchell's doctor ordered him to return to work two weeks later with restrictions on lifting and using his left shoulder. Upon his return, Pilgrim's assigned Mitchell to the picking room, where he picked feathers off chickens. Mitchell received the same hourly wage as before his surgery.

Mitchell had a follow-up appointment with his doctor on August 31, 2015. Mitchell's doctor determined that Mitchell had reached maximum medical improvement for his left shoulder. However, Mitchell still had to complete two more weeks of physical therapy. Mitchell also complained of pain in his right shoulder, and his doctor determined that an MRI of his right shoulder was necessary.

As he had in the past, Mitchell brought the paperwork from his doctor's appointment to Gay Papoi, a licensed practical nurse who worked in the occupational health department at Pilgrim's. Papoi told Mitchell's supervisors, Burnham and Johnson, that it would "not [be] a good idea for [Mitchell] to go back to live hang" because he "just had surgery," live hanging "would aggravate his postoperative shoulder," and he was having "pain in his other shoulder." Although Papoi did not

3

say that Mitchell could not return to the live shed—she felt it was "not [her] position as a nurse" to do so—she "recommended that he not return."

Despite not being assigned to the live shed, on September 1, 2015, Mitchell reported to the live shed dressed as a live hanger. Mitchell was "merely standing in the live hang area" and "did not actually hang any birds," although he "caught one leg." Burnham told Mitchell to stop hanging, and Mitchell walked off the line without saying anything.

Burnham left to find Johnson and told him Mitchell "was live hanging and did not go to the picking room as requested." Johnson told Burnham that, the day before, he told Mitchell "he was not to hang until released by the plant nurse," and Burnham said he had given Mitchell the same instructions. Burnham and Johnson went back to where Mitchell was, and Mitchell told them that his doctor had released him to full duty. Johnson told Mitchell he was not needed in the live shed because they had a "full crew" already. Johnson also said he could terminate Mitchell for insubordination and told him to go to a waiting area until human resources showed up. Mitchell and Johnson met with a human resources officer later that day. Johnson and the human resources officer told Mitchell that he was being suspended because he had not been cleared by nursing staff to return to the live shed.

Mitchell was then suspended for insubordination pending investigation. While Mitchell was suspended, Bobby Riley—a human resources manager—

4

confirmed with nursing staff that Mitchell "had not followed medical protocol." After obtaining statements from Burnham and Johnson, Riley made the decision to terminate Mitchell.    On September 3, 2015, Pilgrim's sent Mitchell a letter explaining that he had been terminated for insubordination.

Mitchell later filed a union grievance for unjust termination.    Pilgrim's, Mitchell, and the union ultimately agreed that Mitchell would be "reinstated with no back pay" and "assigned [a] new job."    Mitchell signed a grievance resolution setting out the terms of the parties' agreement.

After settling the grievance, Riley met with nursing staff and the operations team to find a job where Mitchell "wouldn't have to be reaching overhead [or] doing a lot of the stuff that he'd been doing in live hanging."    Riley also met with Mitchell, who asked not to work on Saturdays.    On October 20, 2015, Pilgrim's reinstated Mitchell and assigned him to the mechanically separated chicken (MSC) department.    Mitchell believed that he was assigned to the MSC department because Johnson and Raul Lagos, a human resources officer, "thought it was easy work" and "would have been better on [his] shoulder."

Mitchell's pay in the MSC department was lower than what he received before his termination.    His job consisted of making boxes, grating chicken bones, and stacking boxes on pallets.    Mitchell also had to lift forty-pound boxes above shoulder height on occasion.    Eventually, Mitchell complained to his supervisor about having

5

to lift heavy boxes, and his supervisor suggested that Mitchell switch tasks with another employee. Mitchell believed that option "was not feasible because then [he] would have been singled out by [his] fellow employees," who "would have accused [him] of not doing good work" and possibly file complaints that could lead to him getting fired. Mitchell never spoke with anyone at human resources about his complaints regarding the MSC position.

In December 2015, Mitchell told the occupational health department that he was experiencing pain in his left shoulder. Nursing staff scheduled Mitchell for a follow-up appointment with his doctor, and Mitchell was seen a few days later. The doctor again noted that Mitchell had reached maximum medical improvement in his left shoulder and clarified that Mitchell had a 6% permanent impairment rating. The doctor released Mitchell without any work restrictions.

In June 2016, Mitchell had another doctor's appointment due to shoulder pain. Mitchell told his doctor that he was doing "repetitive work lifting 50-pound boxes" and that it was causing him "more pain" in his shoulder. Mitchell's doctor restricted him from doing overhead lifting and from lifting more than ten pounds for the following four weeks. Pilgrim's then transferred Mitchell to the salvage department, where his job consisted of removing salvageable parts from defective chickens and did not require any lifting.

Mitchell worked in the salvage department from June 2016 until May 2018. Mitchell never had any medical complaints about his ability to do the salvage job. However, Mitchell had interpersonal issues with two of his colleagues. Specifically, two colleagues "took issue" with the fact that Mitchell used approved FMLA leave for hypertension and "missed a few days of work." Those two colleagues complained about Mitchell to his supervisor and, knowing "how [they] [we]re," the supervisor decided to move Mitchell to the neck chiller department.

Mitchell had been approved for intermittent FMLA leave for hypertension since May 2016. Every time Mitchell applied for FMLA leave, it was granted. Mitchell was familiar with how to take FMLA leave and, other than the interpersonal issue in the salvage department, never had any problems doing so.

As a neck chiller, Mitchell was responsible for boxing up chicken necks. Specifically, Mitchell made boxes and placed them on a conveyor belt, and chicken necks dropped into the boxes. The conveyor belt would then take the boxes to another room, where they were processed for shipment. Mitchell "[didn't] have a problem" being moved to the neck chiller department. At a deposition taken in June 2018, Mitchell said that things were "going well" and he did not have any limitations on his ability to do the job. However, Mitchell continued to have pains and said "[i]t would be the same way" even if he were to return to live hanging.

7

Mitchell still had to pick up forty-pound boxes and stack them, which aggravated his shoulder pain.

## PROCEDURAL HISTORY

On March 22, 2017, Mitchell sued Pilgrim's in Florida state court. Pilgrim's removed the action to the Middle District of Florida, and the district court later ordered Mitchell to file an amended complaint. On July 14, 2017, Mitchell filed an amended complaint containing three counts.

In count one, Mitchell argued that Pilgrim's discriminated against him on the basis of race. Specifically, Mitchell alleged that, as an African-American, he was "treated differently than similarly situated white employees." He alleged that he was falsely suspended and terminated for insubordination and noted that "a nearly identical white employee who sustained the same or a similar injury . . . was not relocated to another position after his injury nor demoted." Mitchell also complained about his assignment to the MSC department—which he alleged was a "demoted position"—and his reduction in pay in connection with that assignment.

In count two, Mitchell alleged that Pilgrim's harassed and terminated him for "taking time off that was protected under the FMLA." Specifically, Mitchell alleged that, after taking leave for his surgery in January 2015, "[Pilgrim's] harassed [him] and took adverse personnel actions against him for using leave and refused to return him to the position [he had] prior to his protected leave." Mitchell further alleged

8

that "[Pilgrim's] then fired him[,] and when he was reinstated pursuant to a union grievance, [Pilgrim's] demoted him to a more difficult position to perform in light of his prior medical condition and surgery." Finally, Mitchell alleged that he "was denied rights and benefits conferred by the FMLA."

In count three, Mitchell alleged that Pilgrim's discriminated against him on the basis of a disability or perceived disability. Specifically, Mitchell alleged that Pilgrim's was "liable for the differential treatment and actions against [him] after he took time off for his surgery, worked in a light duty capacity[,] and attempted to return to work in his live hanging position." Mitchell also alleged that he "needed accommodations in the form of time off work for his surgery and light duty for a period of around six months [thereafter]." He alleged that his position in the MSC department "require[d] him to use his shoulder in a way that cause[d] him pain" and was "more physically taxing" because he had to help lift fifty-pound boxes.

During discovery, Pilgrim's asked Mitchell to identify which employees he believed had been treated more favorably than he had. Mitchell identified three white employees: Johnson, Joyce Grantham, and a male electrician whose name Mitchell could not remember. Mitchell said that Johnson had issues with his back and had to go home on occasion but still got to keep his job. Likewise, Mitchell said that Grantham had surgery on her wrist, arm, and shoulder and was permitted to

9

return to work doing her regular job.  Finally, Mitchell said that the electrician had fainted and injured his head but was never required to leave work or change duties.

After discovery, Pilgrim's moved for summary judgment.  Pilgrim's argued that it was entitled to summary judgment on Mitchell's discrimination claims because he failed to establish a prima facie case of discrimination or establish a triable issue of pretext under the <u>McDonnell Douglas Corp. v. Green</u>, 411 U.S. 792 (1973) burden-shifting test.  Pilgrim's argued that Mitchell failed to show he was "qualified" to work as a live hanger and that his alleged comparators were not sufficiently similar to infer disparate treatment.  Pilgrim's also argued that it was entitled to summary judgment on Mitchell's FMLA claim because Mitchell could not "point to a single instance when he was prevented from exercising his rights under the FMLA, as required for an interference claim" and there was no evidence of FMLA retaliation.

In response, Mitchell argued that he was qualified to work as a live hanger and that he identified sufficiently similar comparators to infer disparate treatment. Citing to a sworn affidavit he prepared, Mitchell referenced a previously unmentioned comparator—Ed Conquer—"a maintenance worker who injured his rotator cuff but was allowed to do his same job even with a sling on."  Mitchell also argued that he was not required to satisfy the "rigid <u>McDonnell Douglas</u> standards" and that, even if he failed to identify a comparator, he could survive summary

10

judgment if he presented a "convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination."  As for his FMLA claim, Mitchell argued that he had established prima facie cases of interference and retaliation because, after taking FMLA leave, he was transferred from the salvage department to the neck chiller department where he was required to do heavy lifting.

The district court issued a lengthy order granting summary judgment in favor of Pilgrim's on all three counts.  Beginning with count one, race discrimination, the court noted that the crux of Mitchell's claim was that, "unlike white employees who suffered workplace injuries but were permitted to return to or continue in their jobs, Mitchell was terminated for his attempt to return to his job."  The court concluded that Pilgrim's was entitled to summary judgment on Mitchell's race discrimination claim because Mitchell's proffered comparators were not sufficiently similar to establish a prima facie case under McDonnell Douglas and he had otherwise presented no evidence from which a reasonable jury could infer race discrimination.

On count two, the FMLA claim, the district court declined to consider Mitchell's allegations regarding his transfer from the salvage department to the neck chiller department because the transfer "occurred in May of 2018, nearly a year after he filed his [a]mended [c]omplaint."  The district court noted that "Eleventh Circuit precedent precludes a plaintiff from amending his complaint through argument at the summary judgment phase of proceedings," and, as such, the district court limited

11

its analysis to the allegations in Mitchell's amended complaint. The district court concluded there was no genuine dispute that Pilgrim's did not interfere with Mitchell's FMLA rights because he "never sought or used FMLA leave to address his ongoing shoulder problems" and there was no evidence that Pilgrim's ever denied or interfered with his FMLA requests regarding his hypertension. The court also concluded that the undisputed facts entitled Pilgrim's to summary judgment on his FMLA retaliation claim because "the adverse employment actions alleged in his [a]mended [c]omplaint all occurred before Mitchell requested [his] FMLA leave."

Finally, the district court concluded that Pilgrim's was entitled to summary judgment on count three—the disability discrimination claim. As for Mitchell's theory of disparate treatment, the district court concluded that Mitchell's proffered comparators were not sufficiently similar to establish a prima facie case under McDonnell Douglas and he had otherwise presented no evidence from which a reasonable jury could infer discrimination. As for Mitchell's failure-to-accommodate theory, the court concluded that there was no genuine dispute of material fact that Pilgrim's had provided Mitchell reasonable accommodations for his disabilities. In doing so, the court refused to consider Mitchell's allegations, raised for the first time in his response in opposition to summary judgment, that Pilgrim's "failed to provide him with reasonable accommodations immediately following his surgery in 2015, and also failed to do so when it transferred him to the

12

[n]eck [c]hiller [d]epartment in 2018." These claims, the district court determined, were an improper attempt to add to the allegations in his amended complaint.

## STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. Sconiers v. Lockhart, 946 F.3d 1256, 1262 (11th Cir. 2020). Summary judgment is appropriate when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine dispute as to any material fact and compels judgment as a matter of law. Fed. R. Civ. P. 56(a).

## DISCUSSION

Mitchell appeals the district court's grant of summary judgment in favor of Pilgrim's. First, he argues that the district court erred by concluding that he improperly attempted to amend his complaint by including new allegations in his response in opposition to summary judgment. Second, he argues that the district court erred by granting summary judgment on his race discrimination claim because he satisfied the McDonnell Douglas burden-shifting test, he presented a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination, and Pilgrim's non-discriminatory reason for firing him—his insubordination—was a pretext for discrimination. Third, Mitchell argues that the district court erred by granting summary judgment on his disability discrimination claim because he presented evidence of disparate treatment and a failure to

13

reasonably accommodate his disability. And fourth, Mitchell argues that the district court erred by granting summary judgment on his FMLA claims because he established prima facie cases of interference and retaliation.

*Mitchell's Improper Attempt to Amend his Complaint*

The district court refused to consider certain allegations in Mitchell's response in opposition to summary judgment because the response can't be used as a backdoor and unauthorized attempt to amend his complaint. Mitchell argues that the district court erred in refusing to consider those allegations because some of them were "specifically described in his [a]mended [c]omplaint," and the others amounted to "additional evidence of ongoing discrimination and retaliation" that Pilgrim's was already aware of. In other words, Mitchell argues that he "did not add additional claims" or "'amend' his complaint in 'any critical way.'"

"A plaintiff may not amend her complaint through argument in a brief opposing summary judgment." Lightfoot v. Henry Cty. Sch. Dist., 771 F.3d 764, 779 (11th Cir. 2014) (citation omitted). This principle applies here even though Mitchell characterizes the allegations at issue as "additional evidence" rather than "additional claims." See id. at 778–79 (concluding that the district court did not err in declining to consider a "new factual basis" raised for the first time in the plaintiff's response in opposition to summary judgment).

14

Mitchell improperly attempted to offer a new factual basis for his claims. As pleaded in his amended complaint, Mitchell's FMLA and disability claims were based only on events occurring around the time of his surgery and termination in 2015 and his time in the MSC department, which lasted from October 2015 to June 2016. However, in his response in opposition to summary judgment, Mitchell added new allegations about a later transfer from the salvage department to the neck chiller department that happened in May 2018. That transfer took place almost a year after Mitchell filed his amended complaint. If Mitchell sought to stake his FMLA and disability claims on his transfer to the neck chiller department, he should have amended his complaint to state as much. See Lightfoot, 771 F.3d at 779; see also Flintlock Constr. Servs., LLC v. Well-Come Holdings, LLC, 710 F.3d 1221, 1227–28 (11th Cir. 2013) (explaining our refusal to consider "additional facts" included in plaintiffs' motion for summary judgment). Accordingly, the district court did not err in refusing to consider Mitchell's transfer to the neck chiller department.[2]

---

[2] The district court also refused to consider Mitchell's allegation that Pilgrim's "failed to provide him with reasonable accommodations immediately following his surgery in [January] 2015." Specifically, the district court refused to consider Mitchell's allegation that "[w]hile in his sling immediately following his surgery, Mr. Johnson had [Mitchell] work with the vats, which contradicted his restrictions." However, as discussed below, even if the district court erred in refusing to consider this allegation, the district court properly granted summary judgment on Mitchell's disability claim.

15

*Race Discrimination*

The district court entered summary judgment on Mitchell's race discrimination claim because it concluded that Mitchell's proffered comparators were not sufficiently similar to establish a prima facie case under McDonnell Douglas, there was no dispute of fact from which a reasonable jury could infer race discrimination, and Pilgrim's non-discriminatory reason for firing Mitchell—his insubordination—was not a pretext for discrimination. Mitchell argues that his comparators were sufficiently similar to establish a prima facie case under McDonnell Douglas. Alternatively, he argues that he was not required to satisfy the McDonnell Douglas burden-shifting test because he presented a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination. Finally, Mitchell argues that Pilgrim's non-discriminatory reason for firing him— his insubordination—was a pretext for discrimination because it was a "nonsensical charge."

We need not evaluate Mitchell's comparator argument because, even if he presented sufficiently similar comparators, Mitchell failed to establish a genuine issue of fact that his firing for insubordination was a pretext under McDonnell Douglas. At the pretext stage, an employer "must articulate a legitimate nondiscriminatory reason for the challenged employment action." Chapman v. AI Transp., 229 F.3d 1012, 1024 (11th Cir. 2000). "However, the employer's burden

16

is merely one of production; it need not persuade the court that it was actually motivated by the proffered reasons." Id. (citation omitted). "If the defendant articulates one or more such reasons," the plaintiff must "come forward with evidence, including the previously produced evidence establishing the prima facie case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Id. (citation omitted). "If the plaintiff does not proffer sufficient evidence to create a genuine issue of material fact regarding whether each of the defendant employer's articulated reasons is pretextual, the employer is entitled to summary judgment on the plaintiff's claim." Id. at 1024–25 (citation omitted).

Here, Mitchell's only argument as to pretext is that his "alleged 'insubordination' was a nonsensical charge that should not have resulted in [his] termination." Specifically, Mitchell argues that "the fact that [he] had such a long and positive work history with [Pilgrim's], and was never before accused of any sort of insubordination, but was terminated for attempting to return to his job and work, is in itself evidence of pretext." He argues that it "makes little sense" that his conduct "somehow justified skipping the entire progressive discipline policy" because "[t]here were no serious safety threats or immediate hazards, [and he] simply suited up to return to the [live hanging] position."

17

The record indisputably established that Mitchell was fired for insubordination. Mitchell conceded that he returned to the live shed dressed as a live hanger despite being assigned to the picking room. Moreover, Papoi had recommended to Burnham and Johnson that Mitchell not return to the live shed because of his shoulder.[3] While Mitchell was suspended, human resources confirmed with nursing staff that Mitchell "had not followed medical protocol."

Mitchell's long work history does not make Pilgrim's reason for firing him nonsensical. It is undisputed that Pilgrim's considers insubordination—even if it only happens once—a terminable offense. Indeed, the Pilgrim's standards of conduct state that "[f]ailure to follow instructions or perform designated work" will "subject the employee to corrective action, up to and including termination." It is undisputed that Mitchell was aware of those standards. It is likewise undisputed that he was aware of the potential consequences:

> Q.    What would happen generally if you would break one of the rules
>        at the plant? I mean, is there a disciplinary policy?
>
> . . . .
>
> A     If you go against their rules, you'll be fired.

---

[3] Mitchell argues that Pilgrim's "attempt to hide behind Nurse Papoi's belief that the live hang position might exacerbate [his] condition, in spite of his physician's full release, is undermined by the fact that the MSC position . . . involve[d] substantially heavier lifting than the live hang position." This, too, does not establish a triable issue of pretext. Mitchell said he thought he was assigned to the MSC department because Johnson and a human resources officer "thought it was easy work" and "would have been better on [his] shoulder."

18

Q    So there were some instances where someone could be fired immediately?

A    Yes.

Accordingly, Mitchell failed to put forward a triable issue of pretext.

Mitchell's "convincing mosaic" argument fails for the same reason. "[A] plaintiff will always survive summary judgment if he presents circumstantial evidence that creates a triable issue concerning the employer's discriminatory intent." Smith v. Lockheed-Martin Corp., 644 F.3d 1321, 1328 (11th Cir. 2011). "A triable issue of fact exists if the record, viewed in a light most favorable to the plaintiff, presents a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker." Id. (citation, quotation marks, and footnote omitted). Mitchell failed to assemble any type of mosaic, let alone a convincing one. Indeed, Mitchell's only evidence of intent is the supposed pretextual nature of Pilgrim's actions. And, as we explained, Mitchell failed to establish a triable issue of pretext. Accordingly, the district court did not err in granting summary judgment on Mitchell's race discrimination claim.

*Disability Discrimination*

Mitchell raised two theories to support his disability discrimination claim: disparate treatment and failure to reasonably accommodate his disabilities. The district court granted summary judgment on Mitchell's disparate treatment claim because it concluded that Mitchell's proffered comparators were not sufficiently

19

similar to establish a prima facie case under McDonnell Douglas and he presented no evidence to show a genuine dispute on intentional discrimination. The only comparators Mitchell cited in his response in opposition to summary judgment were Grantham and Conquer. They cannot be comparators for Mitchell's disability claim because, like Mitchell, they were disabled; Mitchell pointed to no non-disabled comparator, which is fatal. See Lewis v. City of Union City, 918 F.3d 1213, 1221 (11th Cir. 2019) (en banc) (noting that comparators must be "outside" the plaintiff's protected class); see also Myers v. Hose, 50 F.3d 278, 284 (4th Cir. 1995) ("[A]s used in civil rights law, the notion of 'similarity' generally involves a comparison between a protected class that is subject to disparate treatment and another class of persons. The point of such comparisons is this: because the classes are similarly situated in most relevant respects except their protected status (e.g., gender or race), there arises a rational inference of discrimination on the basis of that status. Myers' argument misses this point, however. Here, the analogy is inapposite because all employees to whom Myers compares himself are also disabled. Thus, this set of circumstances gives rise to no logical inference of handicap discrimination." (citation omitted)). The only other evidence Mitchell cited to prove discriminatory intent was the adverse employment actions taken against him. These adverse actions, in and of themselves, cannot constitute evidence of discrimination—there must be evidence showing a discriminatory intent behind those actions. See Lewis,

20

918 F.3d at 1223 ("Every qualified minority employee who gets fired, for instance, necessarily satisfies the first three prongs of the traditional prima facie case. But that employee could have been terminated because she was chronically late, because she had a foul mouth, or for any of a number of other nondiscriminatory reasons. It is only by demonstrating that her employer has treated 'like' employees 'differently'—i.e., through an assessment of comparators—that a plaintiff can supply the missing link and provide a valid basis for inferring unlawful discrimination."). Accordingly, the district court did not err in rejecting Mitchell's disparate treatment claim.

The district court granted summary judgment on Mitchell's failure-to-accommodate claim because it concluded there was no genuine dispute that Pilgrim's provided Mitchell reasonable accommodations for his disabilities. We agree. When Pilgrim's reinstated Mitchell to the MSC department after his termination, he was not under any medical work restrictions that conflicted with his job duties. Indeed, Mitchell claims that he was "cleared to return . . . with no restrictions" before he was terminated. There was nothing to accommodate. Mitchell also said he thought he was assigned to the MSC department because Johnson and a human resources officer "thought it was easy work" and "would have been better on [his] shoulder." No reasonable jury could conclude from these facts that Pilgrim's failed to accommodate Mitchell's disabilities.

21

Mitchell also argued that Pilgrim's failed to accommodate his disabilities immediately after his surgery—an allegation that, as discussed above, the district court refused to consider. Specifically, Mitchell contends that, "[w]hile in his sling immediately following his surgery, . . . Johnson had [Mitchell] work with the vats, which contradicted his restrictions." But Pilgrim's assigned Mitchell to the picking room to accommodate his work restrictions after his surgery. And Mitchell never informed anyone at Pilgrim's that his work contradicted his restrictions at the time. "[I]n general . . . it is the responsibility of the individual with a disability to inform the employer that an accommodation is needed." Gaston v. Bellingrath Gardens & Home, Inc., 167 F.3d 1361, 1364 (11th Cir. 1999) (quoting 29 C.F.R. pt. 1630 App. § 1630.9); see also Hunt v. Aimco Props., L.P., 814 F.3d 1213, 1226 (11th Cir. 2016) (explaining that, for purposes of the Fair Housing Act, a plaintiff can be said to have made a request for accommodation when the defendant has "enough information to know of both the disability and desire for an accommodation" (citation omitted) (emphasis added)). Mitchell admitted that he didn't say anything to anyone at Pilgrim's "because [he] was trying to get better." Again, no reasonable jury could conclude from these facts that Pilgrim's did not reasonably accommodate Mitchell's disabilities.

Finally, Mitchell complains that Pilgrim's never engaged in an "interactive process" with him. He cites 29 C.F.R. § 1630.2(o)(3) for the proposition that it may

22

be "necessary for the covered entity to initiate an informal, interactive process with the qualified individual" and argues that Pilgrim's never "worked with [him] to find a position that actually suits his medical needs." Even if failure to comply with that regulation could result in a violation of the ADA, see Willis v. Conopco, Inc., 108 F.3d 282, 285 (11th Cir. 1997) ("assuming," without deciding, that "an employer has an affirmative obligation . . . to engage in [an] interactive process"), the undisputed evidence shows that Pilgrim's engaged with Mitchell about his needs. Riley met with Mitchell to discuss potential assignments prior to his reinstatement, and Mitchell accepted the MSC position because it meant he would not have to work on Saturdays. Mitchell believed that he was assigned to the MSC department because Johnson and a human resources officer "thought it was easy work" and "would have been better on [his] shoulder." When Mitchell complained to his supervisor about having to lift heavy boxes, his supervisor offered for Mitchell to switch tasks with another employee. When Mitchell later complained about reemerging pain, nursing staff immediately scheduled Mitchell for a follow-up doctor's appointment. The doctor then released Mitchell without any work restrictions, so it was reasonable for Pilgrim's to keep Mitchell in the same position. When Mitchell was placed on work restrictions six months later, Pilgrim's accommodated his limitations by transferring him to the salvage department. Mitchell never had any medical complaints about his ability to do the salvage job.

23

In sum, the district court did not err in concluding that there was no genuine dispute that Pilgrim's "informally engage[d] with him to respond to his reports of suffering from pain at work."

*FMLA Claims*

The district court concluded that no reasonable jury could find that Pilgrim's interfered with Mitchell's FMLA rights because he "never sought or used FMLA leave to address his ongoing shoulder problems" and there was no evidence that Pilgrim's ever denied or interfered with his FMLA requests. The district court also concluded that the undisputed facts entitled Pilgrim's to summary judgment on Mitchell's FMLA retaliation claim because "the adverse employment actions alleged in his [a]mended [c]omplaint all occurred before Mitchell requested [his] FMLA leave." Mitchell argues that the district court erred by granting summary judgment on his FMLA claims because he established prima facie cases of FMLA interference and retaliation.

We agree with the district court that there was no evidence of interference. To establish an FMLA interference claim, Mitchell had to show "that he was entitled to [an FMLA] benefit denied." Krutzig v. Pulte Home Corp., 602 F.3d 1231, 1235 (11th Cir. 2010) (citation omitted). Further, Mitchell had to show that he was prejudiced by the alleged interference. See Ragsdale v. Wolverine World Wide, Inc., 535 U.S. 81, 89 (2002) (noting that the FMLA provides no relief for an

24

interference claim "unless the employee has been prejudiced by the violation"). Here, there was no such evidence. Mitchell never sought FMLA leave for his shoulder in 2015 and 2016. Mitchell had been on approved intermittent FMLA leave for hypertension since May 2016, and every time he applied for FMLA leave, it was granted. Indeed, the only alleged interference Mitchell complains of pertains to his transfer to the neck chiller department in 2018. As discussed earlier, the district court properly disregarded that allegation because Mitchell did not plead it in his complaint.

There was likewise no evidence of FMLA retaliation. Again, Mitchell only points to his transfer to the neck chiller department, which the district court properly refused to consider. The retaliatory acts cited in Mitchell's complaint all occurred before he requested his FMLA leave. Mitchell cannot claim retaliation based on acts that occurred prior to his request for FMLA leave. See Chapter 7 Tr. v. Gate Gourmet, Inc., 683 F.3d 1249, 1259 (11th Cir. 2012) ("The denial of a light-duty job cannot, therefore, be a materially adverse action causally connected to her EEOC charge because it happened before Gate Gourmet got notice of the charge and an effect cannot precede the cause."); Drago v. Jenne, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We hold that, in a retaliation case, when an employer contemplates an adverse employment action before an employee engages in protected activity,

25

temporal proximity between the protected activity and the subsequent adverse employment action does not suffice to show causation.").

## CONCLUSION

The district court did not err in granting summary judgment in favor of Pilgrim's on Mitchell's race discrimination, disability, and FMLA claims. Accordingly, we affirm.

**AFFIRMED.**